**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

────────────────────────────

**ANGEL M.,**

                              **Plaintiff,**                    **6:20-CV-6373Sr**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**

────────────────────────────

## <u>DECISION AND ORDER</u>

As set forth In the Standing Order of the Court regarding Social Security

Cases subject to the May 21, 2018 Memorandum of Understanding, the parties have

consented to the assignment of this case to the undersigned to conduct all proceedings

in this case, including the entry of final judgment, as set forth in 42 U.S.C. § 405(g).

Dkt. #21.

## BACKGROUND

Plaintiff applied for supplemental security income ("SSI"), with the Social

Security Administration ("SSA"), on May 9, 2016, alleging disability beginning May 8,

2016, at the age of 30, due to his mental health, depression and social problems. Dkt.

#16, pp.57,189 & 212.

On July 26, 2018, plaintiff appeared with a Spanish interpreter and

counsel and testified, along with an impartial vocational expert ("VE"), Stephanie

Archer, at an administrative hearing before Administrative Law Judge ("ALJ"), Michael

Carr. Dkt. #16, pp.34-55. Plaintiff testified that he had completed high school in Puerto

Rico and does not speak English. Dkt. #16, pp.42 & 51. He was fired from his position

at a food station at Wal-Mart[1] because everyone was angry at him and he couldn't

perform his job because of the voices in his mind telling him that everyone was talking

about him. Dkt. #16, pp.41 & 45. He got very angry, started talking bad to people and

wanted to hit them, but ran away instead. Dkt. #16, pp.45 & 47. He testified that the

voices won't leave him alone, which bothers him a lot. Dkt. #16, p.45. He talks to

himself with the voices and becomes angry because he is tired of hearing the voices,

but they won't go away or leave him alone. Dkt. #16, pp.46 & 48. The voices tell him

that his wife wants to leave him or that he should leave his wife and get divorced, which

causes a lot of problems. Dkt. #16, pp.45 & 47-48. One voice belongs to his murdered

brother, which is distracting. Dkt. #16, p.46. He can't concentrate and can't remember

things or do anything on his own because of the voices. Dkt. #16, pp.47-48. His wife

goes with him everywhere because he forgets everything. Dkt. #16, p.48. At home, he

keeps the curtains covered because he feels like somebody is watching him and

doesn't want anyone to be able to see him. Dkt. #16, p.49. When asked if things had

improved after he stopped using drugs, he explained that he continues to hear the

voices every day and that no one understands that his brother is never going to go

away. Dkt. #16, p.50.

---

[1] An Exit Interview from Wal-Mart states that plaintiff threatened coworkers with
violence, stating he would kill them using a gun, and intentionally spilled rotisserie chicken juice
on the floor, creating a slip hazard. Dkt. #16, p.288.

The VE classified plaintiff's past work as kitchen helper, an unskilled, medium exertion position. Dkt. #16, p.51. When asked to assume an individual with plaintiff's age, education and past work experience who could perform simple, repetitive and routine tasks with no more than minimal change to his work environment, no more than occasional contact with supervisors and coworkers and no contact with the general public or tandem work, the VE testified that plaintiff could not perform his past work, but could work as a hand packer, which is a medium exertion, unskilled position, or as a cleaner, which is an unskilled position at either the light or medium exertion level. Dkt. #16, pp.52-53. The VE testified that plaintiff would be precluded from substantial gainful employment if he could not have any contact with coworkers, was off task more than 5% of the workday, or was absent more than one workday per month. Dkt. #16, pp.53-54.

The ALJ rendered a decision that plaintiff was not disabled on December 5, 2018. Dkt. #16, pp.13-28. The Appeals Council denied review on April 6, 2020. Dkt. #16, p.5. Plaintiff commenced this action seeking review of the Commissioner's final decision on June 5, 2020. Dkt. #1.

## DISCUSSION AND ANALYSIS

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). If the evidence is susceptible to more than one rational interpretation, the Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

To be disabled under the Social Security Act ("Act"), a claimant seeking SSI must establish an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.905(a). The Commissioner must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920(a). At step one, the claimant must demonstrate that he is not engaging in substantial gainful activity. 20 C.F.R. § 416.920(b). At step two, the claimant must demonstrate that he has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related activities. 20 C.F.R. § 416.920(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to disability benefits. 20 C.F.R. § 416.920(d). If the impairment does not meet the criteria of a disabling impairment, the Commissioner

considers whether the claimant has sufficient RFC for the claimant to return to past relevant work. 20 C.F.R. § 416.920(e)-(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to the Commissioner to demonstrate that the claimant could perform other jobs which exist in significant numbers in the national economy, based on claimant's age, education and work experience. 20 C.F.R. § 416.920(g).

In the instant case, the ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff had not engaged in substantial gainful activity since the application date of May 9, 2016; (2) plaintiff's borderline personality disorder, psychosis, unspecified type, cannabis use disorder, mild in early remission, opiod use disorder, moderate dependence, and cocaine abuse, continuous, constitute severe impairments; (3) plaintiff's impairments did not meet or equal any listed impairment; (4) plaintiff retained the RFC to perform simple, routine and repetitive work in an environment with no more than minimal change at all exertional levels with occasional contact with supervisors and coworkers, no tandem work and no contact with the general public; and (5) plaintiff was not capable of performing his past work, but was capable of working as a hand packer and cleaner, each of which were unskilled, medium exertion positions or as a cleaner at the light exertional level, and was not, therefore, disabled within the meaning of the SSA. Dkt. #16, pp.21-28.

Plaintiff argues that the ALJ failed to properly evaluate the opinions of plaintiff's treating therapists and that the ALJ's mental RFC determination was not

supported by substantial evidence. Dkt. #20-1, pp.1. More specifically, plaintiff argues that the ALJ's reasons for discounting opinion evidence from plaintiff's therapists were factually inaccurate, noting that plaintiff's toxicology screens had been negative since August 3, 2016 and that although his suicidal ideation and acts of self harm had decreased, his psychologic symptoms remained severe. Dkt. #20-1, p.22. Moreover, plaintiff argues that the ALJ's reliance upon Dr. Harding's opinion was error as that opinion, which was not based upon examination of plaintiff, was provided prior to plaintiff's psychiatric hospitalization. Dkt. #20-1, pp.26-27.

The Commissioner responds that the ALJ properly determined that plaintiff retained the ability to engage in simple, routine and repetitive work with no more than occasional interaction with supervisors, co-workers and the general public. Dkt. #22-1, pp.6-7. The Commissioner argues that it was appropriate for the ALJ to rely upon the opinion on Dr. Harding, a state agency medical consultant, that plaintiff was able to perform the basic mental demands of unskilled work and that it was appropriate for the ALJ to discount the opinions of plaintiff's therapists, as they failed to consider plaintiff's subsequent improvement with continued treatment. Dkt. #22-1, pp.10-13. The Commissioner argues that the moderate mental limitations supported by the medical record did not preclude performance of unskilled work. Dkt. #22-1, p.14.

On July 22, 2016, state agency psychological consultant T. Harding, Ph.D., reviewed the medical record and opined that plaintiff would be expected to be capable of performing the four basic mental demands of unskilled work on a sustained

-6-

basis within one year of alleged onset of disability with continued treatment. Dkt. #16, p.64. The ALJ afforded this opinion great weight because it was consistent with the plaintiff's history of improvement with drug abuse abstinence, therapy and psychotropic medication management and supported by mental status examinations. Dkt. #16, p.26. "In the context of a psychiatric disability diagnosis," however, "it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Stewart v. Comm'r of Soc. Sec.*, 515 F. Supp.3d 1 (S.D.N.Y. 2021), *quoting Velazquez v. Barnhart*, 518 F. Supp.2d 520, 524 (W.D.N.Y. 2007). This is especially true where, as here, the non-examining consultant's opinion is nothing more than speculation as to plaintiff's capacity for improvement under conditions of continued treatment.

Plaintiff's therapist, Rebecca O'Neill, LCSW completed a Psychological Assessment for Determination of Employability for the Monroe County Department of Human Services on June 15, 2016, December 27, 2016, and March 29, 2017, indicating that plaintiff was very limited in his ability to follow, understand and remember simple instructions and directions; perform simple and complex tasks independently; maintain attention and concentration; regularly attend to a routine and maintain a schedule; maintain basic standards of hygiene and grooming; and perform low stress and simple tasks. Dkt. #16-1, pp.581-592. On March 27, 2017, LCSW O'Neill indicated that plaintiff was severely compromised due to psychosis and that the duration of his impairment was likely permanent. Dkt. #16-1, pp.583-584.

Darcy Collins, LCSW, completed a Psychological Assessment for Determination of Employability for the Monroe County Department of Human Services on September 11, 2017 and December 11, 2017, indicating that plaintiff was moderately limited in his ability to follow, understand and remember simple instructions and directions; perform simple and complex tasks independently; and maintain attention and concentration and could try solitary work up to ten hours per week. Dkt. #16-1, pp. 573-580. LCSW Collins stated that plaintiff could not work at a fast pace and that interaction with large groups or the public would be contraindicated. Dkt. #16-1, pp.576 & 580. Ms. Collins noted that despite treatment, plaintiff was severely compromised due to psychosis, continued to experience auditory hallucinations and may not be able to work at any time. Dkt. #16-1, pp.584, 588 & 592.

The ALJ afforded these opinions little weight because they did not adequately account for plaintiff's subsequent improvement and because the check-the-box format was not persuasive and the rationale provided by Ms. Collins was "thin." Dkt. #16, p.26. The ALJ also noted that Ms. Collins was not an acceptable medical source.[2] Dkt. #16, p.26.

In support of his determination that plaintiff was not disabled, the ALJ repeatedly relied upon his assessment of plaintiff's improvement with therapy, medication management and abstinence from drug use, finding that "the record

_____

[2] Licensed Clinical Social Workers are not considered "acceptable medical sources" for purposes of disability determinations and their opinions are not, therefore, entitled to controlling weight. *Martino v. Comm'r of Soc. Sec'y*, 339 F. Supp.3d 118, 128 (W.D.N.Y. 2018).

demonstrates that both the nature and frequency of the hallucinations have improved."
Dkt. #16, p.25. The ALJ also noted that in April 2017, plaintiff's psychiatrist, Anca
Seger, M.D. indicated that plaintiff's perceptory disturbances were more likely part of a
post-withdrawal syndrome composed by his grief and a cultural component. Dkt. #16,
p.25.

While there is some evidence to support the ALJ's determination that
plaintiff's condition had improved, there is insufficient evidence to support the ALJ's
determination that plaintiff could engage in substantial gainful employment. Rather, as
set forth in detail below, the record reflects that throughout the period at issue, despite
successful completion of substance abuse treatment and abstinence from drug use[3]
and despite consistent use of high doses of multiple psychotropic medications, plaintiff
continued to demonstrate obvious and significant psychiatric symptoms, including
hallucinations.

On May 10, 2016, plaintiff's parents brought him to the emergency room
after his mother found him in the bathroom bleeding from a self-inflicted wound to his
wrist crying that he wanted to die. Dkt. #16, pp.312. While in the emergency room,
plaintiff "slit his left wrist with a blade." Dkt. #16, p.312. He reported that he had not

---

[3] Plaintiff sought treatment for substance abuse problems on May 17, 2016, admitting a
history of heroin and cocaine abuse since the age of 13, with his most recent use on April 17,
2016. Dkt. #16, p.327. He indicated that he used substances "to stop the voices." Dkt. #16,
p.342. Plaintiff was discharged from substance abuse treatment on March 17, 2017 with all
treatment goals met. Dkt. #16, p.438. During the course of treatment, he underwent 24
toxicology screens, which were negative except for June 23, 2016, June 29, 2016, July 5, 2016
and July 12, 2016. Dkt. #16, p.437.

been doing well since his brother was murdered in April. Dkt. #16, pp.312 & 381. He

saw his brother staring at him every time he looked in the mirror and heard his brother

asking: "Why haven't you hung yourself already?" Dkt. #16 p.312. Plaintiff was

observed to be extremely agitated, shaking, pacing and had to be medicated. Dkt. #16,

pp.312 & 316. His toxicology screen "was only positive for Cannabis." Dkt. #16, p.312.

He was admitted to the psychiatric unit for safety and stabilization and discharged on

May 13, 2016, after stabilizing with Seroquel, with a diagnosis of bipolar disorder with

psychotic features. Dkt. #16, pp.312 & 322.

On June 21, 2016, Dr. Seger increased plaintiff's dose of Seroquel. Dkt.

#16, p.466. On July 1, 2016, plaintiff reported to his therapist that the increased

medication was providing relief from more severe symptoms and that he was hearing

his brother's voice less and feeling less distressed. Dkt. #16, pp.499-500.  On July 5,

plaintiff reported continued improvement in mood with mitigation of more severe

psychoses, with his brother's voice becoming quieter since he began medication. Dkt.

#16, p.517.

On August 30, 2016, however, plaintiff presented tearful and quite

unhappy to his therapist, reporting that he experienced difficulty sleeping because his

deceased brother calls him on the phone[4] and keeps him up. Dkt. #16, p.617. He also

believed that two dead homeless people were following him and came in through the

---

[4] Plaintiff's wife completed a questionnaire indicating that plaintiff broke his phone
because he thought it was ringing all the time. Dkt. #16, p.240.

window last night. Dkt. #16, p.617. Plaintiff's therapist noted that his toxicology screen came back negative for cannabis and other drugs and that plaintiff continued to battle psychosis despite reporting that he was taking his medications daily. Dkt. #16, p.617.

On September 1, 2016, plaintiff reported that he was not sleeping well and described elaborate dreams around his brother's death or demons chasing him, despite reported compliance with medication. Dkt. #156, p.635. He was observed to be restless and anxious, with pressured and overactive speech. Dkt. #16, pp.636-637.

On September 13, 2016, plaintiff's therapist opined that it was possible that plaintiff was at baseline. Dkt. #16, p.658.

On September 19, 2016, Dr. Seger reported that despite his compliance with and benefit from medication, plaintiff continued to describe feeling touched by the devil, questioned the presence of scorpions on the floor and continued to focus on his brother's death, with occasional dreams that seem to have become even more animated and colorful. Dkt. #16, p.695. Dr. Stenger observed "no formal thought disorder, no delusional thought content" and "intact insight and judgment," noting "incongruence between his reported experiences and his affect, as he seems to grin as his descriptions of his perceptory experiences go into more and more detail." Dkt. #16, p.695. Dr. Seger increased plaintiff's dose of Seroquel. Dkt. #16, p.696.

On October 13, 2016, plaintiff's therapist again opined that plaintiff appeared to be at baseline, presenting as calm, but continuing to report hearing the

voice of his dead brother. Dkt. #16, p.714. Plaintiff asked to take his medication during the day, as "the voices during the day are especially worrisome." Dkt. #16, p.716.

On October 14, 2016, plaintiff reported that he was sad, was not sleeping well and was still hearing voices, which upsets him. Dkt. #16, p.732. He reported that he talks to his dead brother before he goes to be and his brother tells him life is beautiful. Dkt. #16, p.732. He reported compliance with medication, but was determined to be taking Seroquel just once a day in the morning instead of twice a day. Dkt. #16, p.732. He was counseled and receptive to taking the correct doses. Dkt. #16, p.736. He was observed to be restless, sad, irritable, anxious, constricted, loud and spontaneous. Dkt. #16, p.734.

On November 10, 2016, LCSW O'Neill reported that plaintiff was at baseline with a constricted affect, paranoid delusions, and depressed, anxious mood . Dkt. #16, pp.754-755.

On December 7, 2016, plaintiff's primary care physician conducted a depression screening which indicated severe depression. Dkt. #16-1, p.752.

On December 9, 2016, plaintiff presented to LCSW O'Nelil holding a tissue to his left wrist, explaining that he and his brother decided to cut his wrist at the clinic where his wife could not see, because she was always watching him. Dkt. #16, p.773. LCSW O'Neill advised plaintiff that he would need to go to the hospital; plaintiff

responded that his brother would be joining him in the ambulance. Dkt. #16, p.773. LCSW O'Neill observed that plaintiff was tremulous and tearful and appeared responsive to internal stimulation. Dkt. #16, p.773. She observed that plaintiff was agitated, anxious, depressed, tearful, perseverative, disorganized, preoccupied, ruminative and experiencing auditory and visual hallucinations. Dkt. #16, p.774. When called, plaintiff's wife reported that plaintiff had been taking his medication and doing well. Dkt. #16, p.773.

During his psychiatric hospitalization, plaintiff reported "specifically hearing his brother tell him to kill himself to be with his brother" and was observed to be responding to internal stimuli and demonstrating depressed mood. Dkt. #16, pp.374, 378 & 390. Plaintiff reported that he wanted to kill himself so he and his brother could be together and expressed his belief that he could return from the dead after he visited with his brother. Dkt. #16, p.390. He reported that his brother talks to him all the time and that he has heard other voices for years. Dkt. #16, p.390. He was observed to be disorganized, responding to auditory hallucinations, with anxious affect, pressured speech, and depressed mood. Dkt. #16, p.390. He was discharged on December 13, 2016 with a diagnosis of unspecified psychosis not due to a substance or known physiologic condition after his psychotic symptoms stabilized with medication. Dkt. #16, pp.369 & 393.

On Janaury 4, 2017, plaintiff's primary care physician observed that he was anxious and depressed. Dkt. #16-1, p.749.

On January 9, 2017, Dr. Seger noted that plaintiff:

> says he is not using drugs anymore, attends CD treatment,
> reports compliance with medications and seems to benefit
> from them, tolerated well the addition of olanzapine. He
> mentioned seeing demons, the devil, feeling touched by it
> today. He has not hurt himself recently. Remains focused on
> brother's death. Of note, he presents very well groomed,
> very talkative, there is no formal thought disorder, no
> delusional thought content, his insight is intact as is his
> judgment. At all times, visual hallucinations are more often
> associated with substance induced psychosis. I suspect his
> perceptory disturbances are more likely part of a post-
> withdrawal syndrome composed by his grief and the cultural
> component.. . . I suspect character pathology plays a
> significant role as well.

Dkt. #16-1, p.20.

On February 7, 2017, plaintiff reported to his therapist that he was feeling well and continues to have frequent contact with his deceased brother, explaining that he enjoys his closeness with his brother, who appears as white and speaks to him. Dkt. #16-1, p.41. LSCW O'Neill, explored PROS[5] with plaintiff but noted that plaintiff did not feel ready to do that yet. Dkt. #16-1, p.41.

On February 9, 2017, plaintiff's primary care physician conducted a depression screening which indicated severe depression. Dkt. #16-1, p.737.

---

[5] The Personalized Recovery Oriented Services ("PROS"), program is a comprehensive model that integrates rehabilitation, treatment and support services for individuals with serious mental illnesses, with a goal of promoting independence and improving quality of life through, *inter alia*, social and basic life skills training, problem solving and coping skills, housing assistance, vocational training, clinical counseling and health assessment and symptom monitoring and medication management. www.omh.ny.gov

On March 30, 2017, LCSW O'Neill reported that plaintiff was calm and in good demeanor. Dkt. #16-1, p.60. She noted that plaintiff

> [c]ontinues to endorse hallucinations involving dead brother at baseline. He has been working with Dr. Seger and we contginue our dialogue re: patient's [symptoms] with questions about former [history] of drug use and how this may relate to his report of psychoses, as well as his personality [disorder] traits.

Dkt. #16-1, p.61. Although she opined that plaintiff has been doing well overall, she noted that plaintiff has been considered high risk secondary to his event of cutting risk at clinic. Dkt. #16-1, p.61. LCSW O'Neill noted that plaintiff's spouse continued to administer his medications. Dkt. #16-1, p.61.

On April 6, 2017, plaintiff's primary care physician conducted a depression screening which indicated severe depression. Dkt. #16-1, p.712.

On April 26, 2017, plaintiff's new therapist, LCSW Collins, noted that plaintiff appeared restless and sad with a constricted affect. Dkt. #16-1, p.100. Plaintiff reported sadness related to the anniversary of his brother's death and difficulty sleeping with low energy and appetite disturbance. Dkt. #16-1, p.100.

On May 16, 2017, plaintiff was observed to be sad, anxious, tearful and restless, reporting that his wife was tired of dealing with him and "everyone in the world leaves me." Dkt. #16-1, p.142.

On June 15, 2017, plaintiff reported ambivalence about the possibility of divorce and reported dropping his phone and breaking it because he was investigating demons that had entered his apartment. Dkt. #16-1, p.183. LCSW Collins noted that this experience appeared related to grief and cultural/spiritual beliefs rather than a delusional process. Dkt. #16-1, p.182. LCSW Collins reported that plaintiff continues to find comfort that his brother "comes in the door and talks to me every night." Dkt. #16-1, p.182.

On June 21, 2017, plaintiff reported that he is taking all his medications as prescribed and felt calmer with the Olanzapine, but was afraid to eliminate Seroquel. Dkt. #16-1, p.202. He reported that there are demons in the house and that he hurt himself trying to catch one going down the drain. Dkt. #16-1, p.202. He was still communicating with his dead brother. Dkt. #16-1, p.202. Dr. Seger noted that despite taking two antipsychotics at high doses, plaintiff continues to report the same symptoms and continues to function at the same level. Dklt. #16-1, p.205. Dr. Seger continued with Seroquel and Olanzapine as plaintiff seems to have better mood stability and less impulsivity on this regimen. Dkt. #16-1, p.,205.

On February 1, 2018, plaintiff's primary care physician conducted a depression screening which indicated severe depression. Dkt. #16-1, p.704.

On February 20, 2018, LCSW Collins noted that plaintiff appeared to be at his baseline, largely isolated in his home and continuing to speak about "seeing dead

people, people in white" and having his voice called in the shower. Dkt. #16-1, p.545.

On March 19, 2018, noting that plaintiff continues to present at his baseline, LCSW Collins determined that it would be appropriate to investigate if Spanish track PROS could be an option for plaintiff. Dkt. #16-1, p.568. He had previously not been admitted to the program because of his presentation. Dkt. #16-1, p.568.

On June 4, 2018, plaintiff was seen by Scott Amos, M.S., Ph.D., for diagnostic clarification. Dkt. #16-1, p.616. Plaintiff was observed to be anxious and agitated but engaged. Dkt. #16-1, pp.616-617.

On June 19, 2018, it was noted that plaintiff maintained his abstinence from substance use. Dkt. #16-1, p.620. He advised that he observed his brother at a park when he was swinging. Dkt. #16-1, p.620.

As is evident from this exhaustive recitation of the evidence, the ALJ's rationale for rejecting the medical source opinions of LCSW O'Neill and LCSW Collins is not accurate and the ALJ's determination of plaintiff's RFC is not supported by substantial evidence. *See Shamone W. v. Comm'r of Soc. Sec'y*, 2021 WL 1015934, at *6 (W.D.N.Y. Mar. 17, 2021) (rejecting ALJ's formulation of an RFC that was completely divorced from the assessments reflected in each of the opinions of record). Where, as here, application of the correct legal standards to all of the relevant evidence, including

acceptable medical source opinion evidence and other source opinion evidence, compels the conclusion that plaintiff is disabled, remand for calculation of benefits is warranted. *See Trumpower v. Colvin*, 2015 WL 162991, at *18 (W.D.N.Y. Jan. 13, 2015) (remanding for calculation of benefits based upon medical source opinion of Licensed Master Social Worker).

## CONCLUSION

Based on the foregoing, plaintiff's motion for judgment on the pleadings (Dkt. #20), is granted and this matter is remanded for the calculation of benefits and the Commissioner's motion for judgment on the pleadings (Dkt. #22), is denied.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**DATED:**     **Buffalo, New York**
          **September 30, 2021**

                    **s/ H. Kenneth Schroeder, Jr.**
                **H. KENNETH SCHROEDER, JR.**
                **United States Magistrate Judge**